**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MARK CASWELL, On Behalf Of Himself And All Others Similarly Situated, Plaintiff, | Civil Action No. |
| vs. | |
| TEREX CORPORATION, RONALD M. DEFEO, G. CHRIS ANDERSON, PAULA H. J. CHOLMONDELEY, DONALD DEFOSSET, WILLIAM H. FIKE, THOMAS J. HANSEN, DONALD P. JACOBS, DAVID A. SACHS, OREN G. SHAFFER, DAVID C. WANG, HELGE H. WEHMEIER, THE ADMINISTRATIVE COMMITTEE OF THE TEREX CORPORATION AND AFFILIATES' 401(k) RETIREMENT SAVINGS PLAN, PHILLIP C. WIDMAN, and JOHN DOES 1-20, | JURY TRIAL DEMANDED |
| Defendants. | February 24, 2010 |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE**
**EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA")**

Plaintiff, a participant in the Terex Corporation and Affiliates' 401(k) Retirement Savings Plan (the "Plan"), covering substantially all employees of Terex Corporation ("Terex" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), alleges as follows:

## INTRODUCTION

1. This is a class action brought pursuant to § 502 of ERISA, 29 U.S.C. § 1132, against the Plan's fiduciaries, including Terex, on behalf of Participants in and beneficiaries of the Plan.

2. Throughout the Class Period (February 20, 2008 to February 11, 2009), the Plan

invested in Terex common stock ("Terex Stock" or "Company Stock"), which was offered as one of the investment alternatives in the Participant Contribution Component of the Plan.

3. Plaintiff's claims arise from the failure of Defendants, who are Plan fiduciaries, to act solely in the interest of the Participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

4. This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

5. As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

6. Because Plaintiff's claims apply to the Participants and beneficiaries as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants and beneficiaries of the Plan during the Class Period. Plaintiff also brings this action as a participant seeking plan-wide relief for breach of fiduciary duty on behalf of the Plan.

7. In addition, because the information and documents on which Plaintiff's claims

are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

8. ***Subject Matter Jurisdiction.*** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

9. ***Personal Jurisdiction.*** ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States and/or do business in the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the District of Connecticut as they all reside in the State of Connecticut and/or do business in the State of Connecticut.

10. ***Venue.*** Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some Defendants reside or

maintain their primary place of business in this District.

## PARTIES

### Plaintiff

11. ***Plaintiff*** Mark Caswell is a resident of Chickasaw County, Iowa. Plaintiff is a former Terex employee and is a participant in the Plan.

### Defendants

12. ***Defendant Terex*** operates as a diversified global manufacturer. The company manufactures a range of equipment for use in various industries, including the construction, infrastructure, quarrying, surface mining, shipping, transportation, refining, and utility industries. The Company maintains its corporate headquarters at 200 Nyala Farm Road, Westport, Connecticut 06880.

13. Throughout the Class Period, Terex's responsibilities included, along with its officers, directors, and executives, broad oversight of and ultimate decision-making authority respecting the management and administration of the Plan and the Plan's assets, as well as the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility. Throughout the Class Period, the Company exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

14. ***Defendant Terex Board of Directors***. The Directors who served on the Terex Board of Directors (the "Board") were fiduciaries, because they exercised decision-making authority regarding the appointment of Plan fiduciaries and the management of the Plan's assets throughout the Class Period. Among other things, the Board determines the annual profit sharing

contributions that are made under the Plan. Moreover, Terex acted through the Board in carrying out its Plan-related fiduciary duties and responsibilities, and, thus, members of the Board were fiduciaries to the extent of their personal exercise of such responsibilities.

15. The "Director Defendants" who served on the Board and acted as fiduciaries with respect to the Plan during the Class Period are as follows:

(a) ***Defendant Ronald M. DeFeo ("DeFeo")*** is, and at all relevant times was, a member of the Company's Board. DeFeo is Chairman of the Board and Chief Executive Officer of Terex. During the Class Period, DeFeo was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(b) ***Defendant G. Chris Andersen ("Andersen")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, Andersen was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

© ***Defendant Paula H.J. Cholmondeley ("Cholmondeley")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, Cholmondeley was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or

discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

(d) ***Defendant Donald DeFosset ("DeFosset")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, DeFosset was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(e) ***Defendant William H. Fike ("Fike")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, Fike was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(f) ***Defendant Thomas J. Hansen ("Hansen")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, Hansen was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the

Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(g) ***Defendant Donald P. Jacobs ("Jacobs")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, Jacobs was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(h) ***Defendant David A. Sachs ("Sachs")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, Sachs was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(I) ***Defendant Oren G. Shaffer ("Shaffer")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, Shaffer was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of

the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(j) ***Defendant David C. Wang ("Wang")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, Wang was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(k) ***Defendant Helge H. Wehmeier ("Wehmeier")*** is, and at all relevant times was, a member of the Company's Board. During the Class Period, Wehmeier was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

16. ***Defendant Administrative Committee of the Terex Corporation and Affiliates' 401(k) Retirement Savings Plan (the "Committee").*** The members of the Committee were named as fiduciaries in the Plan documents and functioned as fiduciaries because they supervise the investment of the assets of the Plan, and make decisions concerning investment options available under the Plan. The Committee is comprised of the following Defendants:

(a) ***Defendant Phillip C. Widman ("Widman")*** has served as Senior Vice

President and Chief Financial Officer of the Company since September 16, 2002. Widman signed, on behalf of the Plan's Trustee, the Company's Form 11-K filed with the SEC on June 25, 2009. He also signed off on the Company's 2007 and 2008 Form 5500 filings as the Plan Administrator.

(b) ***Defendants John Does 1-10*** are or were members of the Committee during the Class Period. These Defendants, whose identities are currently unknown to Plaintiff, may include additional Terex employees. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who are participants in or beneficiaries of the Plan at any time between February 20, 2008 and February 11, 2009 (the "Class Period"), and whose accounts included investments in Terex Stock.

18. Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

19. ***Numerosity.*** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

20. ***Commonality.*** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants acted as fiduciaries;

(b) Whether Defendants breached their fiduciary duties to the Plan, Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plan, and the Plan's Participants and beneficiaries;

© Whether Defendants violated ERISA;

(d) Whether the Plan suffered a loss and, by extension, members of the Class sustained a diminution in vested benefits, and

(e) What is the proper measure of loss to the Plan and subsequent allocation of vested benefits to the Plan's Participants?

21. ***Typicality.*** Plaintiff's claims are typical of the claims of the members of the Class because the Plan, the Plaintiff, and the other members of the Class, each sustained a diminution in vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

22. ***Adequacy.*** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

23. Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of

adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

24. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLAN

### The Plan

25. The Plan is an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A). The purpose of the Plan is to provide long-term retirement savings.

26. The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

27. In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant. Rather, Plaintiff requests relief for the benefit of the Plan and for the benefit of its Participants.

28. The Plan is a "defined contribution plan" or "individual account" plan within the

meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

29. The Plan is a voluntary contribution plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to Participants' individual accounts.

30. In the Company's most recently filed Form 11-K, dated June 25, 2009, the Plan is described as follows:

> General – The Plan is a defined-contribution plan that covers certain salaried and hourly employees of Terex Corporation (the "Company") and its subsidiaries meeting minimum eligibility requirements. The investments of the Plan are held in a trust account by Fidelity Management Trust Company ("Fidelity"), the trustee of the Plan.
>
> The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").
>
> An Administrative Committee, consisting of at least three members appointed by the Company's Board of Directors, administers the benefit structure of the Plan. The Administrative Committee is considered the Plan Administrator for purposes of ERISA.
>
> The Plan permits participants to irrevocably designate some or all of their elective contributions under the Plan as designated Roth contributions. Designated Roth contributions are elective contributions that, unlike pre-tax elective contributions, are

currently includible in the participant's gross income. The Roth contributions are made in lieu of all or a portion of the elective contribution the participant is otherwise eligible to make under the Plan.

* * *

Participant Eligibility – Permanent employees, that are not represented under a collective bargaining agreement, may begin participation on the first day of the month following their hiring.

* * *

Contributions – Participants may contribute a maximum of 80% of their compensation to the Plan in any combination of pre-tax, Roth or post-tax contributions. The maximum pre-tax contribution permitted under Internal Revenue Service ("IRS") regulations in 2008 and 2007 was $15,500. Participants age 50 and older can elect to make additional pre-tax and Roth contributions ("catch-up contributions") up to the limits prescribed by IRS regulations. These additional catch-up contributions are not eligible for matching Company contributions.

The Company provides safe harbor matching contributions of 100% of the first 4% of the participant's contributions, except for Represented employees of Reedrill, Halco and Simplicity.

For Represented employees, the Company contributions are as follows: the Company matches 33.33% of the first 6% of the Reedrill and Halco participant's contribution and 50% of the first 4% of Simplicity participant's contribution to the Plan.

The Company may make, in its sole discretion, supplementary contributions.

Company contributions are made in Terex Corporation common stock, $.01 par value per share ("Common Stock"). Company matching contributions in Common Stock are unrestricted, thereby allowing participants to exchange the value of Common Stock into other investment options.

Effective August 1, 2008, automatic enrollment of 2% of compensation was instituted for participants not subject to

> collective bargaining agreements. As described in Note 11, effective January 1, 2009, automatic enrollment of 2% of compensation was instituted for all Represented employees under the Plan, except for Koehring Represented employees.
>
> Contributions are limited in that the sum of: a) total Company contributions; b) total participant pre-tax contributions; c) total participant Roth contributions and d) total participant post-tax contributions, cannot exceed the lesser of: i) $46,000 or ii) 100% of the participant's total compensation for the year. Participants are able to direct current contributions and redistribute accumulated contributions and earnings between investment alternatives.

31. Additionally, the Company's Form 11-K filed with the SEC on June 25, 2009, indicates that on December 31, 2007, the Plan held $326,067,888 in Net Assets Available for Benefits, of which $91,561,654 (28%) was in Company Stock. It also indicates that as of December 31, 2008, the Plan held $208,101,161 in Net Assets Available for Benefits, of which $32,249,487 (15%) was in Company Stock. During that same one year period, the Form 11-K shows that there was a net depreciation of $68,900,010 in the value of the Plan's investment in Company Stock.

**Plan Fiduciaries**

32. ***Named Fiduciaries.*** ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

33. ***De Facto Fiduciaries.*** ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform

fiduciary functions. Thus, a person is a fiduciary to the extent "(I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(I), 29 U.S.C. § 1002(21)(A)(I).

34. Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing Plan documents, through their conduct, and under ERISA.

35. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan -- and the Plan's investments -- solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

36. Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

**FACTUAL BASIS OF THE FIDUCIARY BREACHES**

37. Terex purports to be a diversified global manufacturer that operates in four business segments: Terex Aerial Work Platforms, Terex Construction, Terex Cranes, and Terex Materials Processing & Mining. The Company also offers a line of financial products and services to assist in the acquisition of Terex equipment through Terex Financial Services.

38. Throughout the Class Period the Company's stock traded at artificially inflated prices while Terex failed to disclose that: 1) it was not properly and timely accounting for certain impaired assets, including in Company's Construction, Roadbuilding and Utility Products businesses; 2) it was experiencing declining demand in the Company's Aerial Work Platforms, Construction and Materials Processing businesses; 3) the Company's financials were weaker than represented; 4) the Company had significant exposure to, and was not prepared to withstand a weakening of, the global credit markets; and 5) it lacked a reasonable basis for the positive statements and representations that it was making concerning the Company's 2008 earnings guidance, and the Company's overall business prospects.

39. The Defendants knew or should have known that this unsustainable business model made Terex Stock an imprudent investment for the Plan and the Participants. Specifically, as demonstrated below, Defendants breached their fiduciary duties to the Class by (1) continuing to invest Plan assets in Company Stock when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in Company Stock; and (3) maintaining the Plan's pre-existing heavy investment in Terex equity when Company Stock was no longer a prudent investment for the Plan.

**The Company's False and Misleading Statements**

40. The Class Period begins on February 20, 2008, when, after the Market closed, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2007, and provided guidance for fiscal year 2008. Specifically, the Company reported net income for the fourth quarter of 2007 of $174.0 million, or $1.67 per share, compared to net income of $100.9 million, or $0.97 per share, for the fourth quarter of 2006. For the full year 2007, the Company reported income from continuing operations of $613.9 million, or $5.85 per share, compared to income from continuing operations of $396.5 million, or $3.85 per share, for the full year 2006.

41. DeFeo, the Company's Chairman and CEO, commented on the results, in pertinent part, as follows:

> For Terex, 2007 was a very strong year in terms of financial performance, with our best sales quarter of the year coming in the fourth quarter. This was a transformational year for our Company, as it demonstrated that the changes made as part of the journey we embarked on a few years back are taking hold and working. We achieved a full year operating margin of 10.5%, net sales grew 19.5% and income from continuing operations was up 55% when compared with 2006. These achievements place us well ahead of the pace we communicated a year earlier in conjunction with our medium term financial goals, and yet the operating margin improvement is still below the potential that we think exists in the Company. We achieved these goals while continuing to have certain product lines of the Company face challenging market conditions in their particular niche. We have benefitted from strong global markets, as well as a relatively small exposure to the U.S. housing market; in fact non-U.S. net sales represented 70% of our total net sales for the full year 2007.
>
> We continue to build a better and stronger operating company while keeping honed the skills of a targeted acquirer of assets. The supply chain and component shortages we are facing continue, but

> we are making steady progress. We continue to invest in improvement projects at an aggressive rate, such as marketing knowledge, sales and service changes, information technology, new product planning processes and the Terex Business System. While these initiatives may not produce immediate benefits, they collectively comprise the cornerstone of our future successes as we build a great company. In 2008, we will build start-up factories in India and China, and potentially other developing markets. In 2007 we successfully acquired Superior Highwall Miners, and expect to close the acquisition of A.S.V., Inc. in the near future. Combined, these facilities and recent acquisitions will provide targeted growth platforms. In 2007, we had a growth rate for net sales of approximately 13% excluding the translation effect of foreign currency exchange rate changes. And while our ROIC level of 43.3% for the year was outstanding, we think this result must be balanced against continued growth to achieve the appropriate mix of growth and returns.

42. Commenting on the Company's outlook for 2008, DeFeo said, in pertinent part, as follows:

> Included in this release is our initial outlook for the 2008 fiscal year. **Reflecting on where we are today with respect to our objective of $12 billion in sales and a 12% operating margin by 2010, we feel we are ahead of our original timeline. And while news headlines continue to broadcast slowing economic conditions in North America and Western Europe, we remain optimistic about prospects for our businesses in both of these markets and continue to see very healthy indicators for continued economic expansion from the developing markets, notably in Asia, Eastern Europe and the Middle East.**
>
> **We are poised to have another record financial performance in 2008.** We expect generally strong global markets to continue to drive demand for our equipment. Add to that our expectation that we will have the ability to produce at greater volumes and with improved productivity, and 2008 looks to be a significant step forward towards our corporate 2010 objective. **It is our expectation that Terex's total revenue for 2008 will be between $10.0 and $10.5 billion, and earnings per share in the range of $6.65 to $7.15 per share.** Expectations are for earnings in the first and second half of 2008 to be approximately equal. Additionally,

> we expect our first quarter results to be approximately 35% - 40% of our first half guidance. (Emphasis added).

43. As a result of this news, on February 21, 2008, the first day of trading after the press release, the Company's stock price surged $4.52 (7%) to close at $66.73 per share.

44. The Company reiterated these results in its Annual Report filed on Form 10-K with the SEC on February 27, 2008. In addition, the Annual Report went on to discuss the Company's policy regarding Goodwill and Impairment of Long Lived Assets. The Annual Report commented, in pertinent part, as follows:

> Goodwill - Goodwill represents the difference between the total purchase price paid in the acquisition of a business and the fair value of the assets, both tangible and intangible, and liabilities we acquired. We review the value of our recorded goodwill annually, and more frequently as circumstances warrant, to determine if this value is potentially impaired. The initial recognition of goodwill, as well as the annual review of the carrying value of goodwill, requires that we develop estimates of future business performance. These estimates are used to derive expected cash flow and include assumptions regarding future sales levels, the impact of cost reduction programs, and the level of working capital needed to support a given business. We rely on data developed by business segment management as well as macroeconomic data in making these calculations. The estimate also includes a determination of the reporting units' weighted average cost of capital. The cost of capital is based on assumptions about interest rates as well as a risk-adjusted rate of return required by our equity investors. Changes in these estimates can impact the present value of the expected cash flow that is used in determining the fair value of goodwill as well as the overall expected value of a given business.
>
> Impairment of Long Lived Assets - Our policy is to assess the realizability of our long-lived assets, including intangible assets, and to evaluate such assets for impairment whenever events or changes in circumstances indicate that the carrying amount of such assets (or group of assets) may not be recoverable. Impairment is determined to exist if the estimated future undiscounted cash flows are less than the asset's carrying value. Future cash flow

> projections include assumptions regarding future sales levels, the impact of cost reduction programs, and the level of working capital needed to support each business. We rely on data developed by business segment management as well as macroeconomic data in making these calculations. There are no assurances that future cash flow assumptions will be achieved. The amount of any impairment then recognized would be calculated as the difference between the estimated fair value and the carrying value of the asset.

45. On April 23, 2008, after the Market closed, the Company issued a press release announcing its financial results for the first quarter 2008. Specifically, the Company reported net income for the first quarter of 2008 of $163.3 million, or $1.59 per share, compared to net income of $113.8 million, or $1.09 per share, for the first quarter of 2007, an increase in earnings per share of 46%.

46. DeFeo commented on the results, in pertinent part, as follows:

> We are pleased with the first quarter's results, with both net sales and net income growth posting solid double digit percentage increases versus the prior year. **The strength of international end markets and the continued strength of the domestic U.S. 'in-the-air' products yielded excellent results in our Aerial Work Platforms and Cranes business segments.** Continued demand for commodities drove favorable results for our Materials Processing & Mining business segment. The performance of the balance of our businesses, namely the Construction, Roadbuilding and Utility operations, were somewhat disappointing for the quarter. We believe, however, that the near term outlook is positive for the Construction segment, and that its operating margin will improve in the mid-year period and lead to good margin expansion on a year-over-year basis in 2008. **In general, we think that all of our operations continue to have solid prospects heading into the remainder of the year.**
>
> * * *
>
> In February, we provided earnings guidance for our 2008 performance, indicating that we anticipated earnings per share to be between $6.65 and $7.15 and net sales to be between $10.0 and

> $10.5 billion. Given our strong performance this quarter, balanced against the uncertainties surrounding some of our end markets and increased input costs, **we now anticipate earnings per share for 2008 to be towards the middle to high end of our previously announced range, or $6.85 to $7.15 per share, on net sales of $10.5 to $10.9 billion.** (Emphasis added).

47. Tom Riordan, Terex President and Chief Operating Officer, added:

> We remain confident about our business outlook for the remainder of 2008. Looking forward, we can see challenges in material costs, especially as we move into the second half of 2008. We intend to address these cost increases through pricing actions to recover lost margin arising from higher component costs. While we anticipate that we will be able to implement these pricing actions timely and effectively, we realize that there is a certain level of risk and exposure that may materialize in the second half of the year.

48. The Company reiterated these results in its Quarterly Report on Form 10-Q filed with the SEC on May 6, 2008. The Quarterly Report went on to discuss impairment charges as follows:

> As of March 31, 2008, the roadbuilding reporting unit within the Roadbuilding, Utility Products and Other segment did not meet the forecasted business performance used in the annual goodwill impairment test as of October 1, 2007. The downturn in the U.S. residential housing market and limited funding for infrastructure projects, has negatively impacted the businesses in which this reporting unit operates.
>
> The Company updated its forecast to address the impact of changes in business conditions and performed a goodwill impairment test as of March 31, 2008 for the roadbuilding reporting unit. The roadbuilding reporting unit passed the test and no impairment charge was recorded. The Company will continue to monitor the estimated fair value of the roadbuilding business for purposes of determining whether impairment is evidenced. The amount of goodwill recorded for the roadbuilding reporting unit as of March 31, 2008 was $34.4.

49. On July 23, 2008, the Company issued a press release announcing its financial

results for the second quarter 2008. Specifically, the Company reported net income for the second quarter of 2008 of $236.3 million, or $2.32 per share, compared to net income of $174.6 million, or $1.66 per share, for the second quarter of 2007, an increase in earnings per share of 39.8%. Net sales of $2,935.9 million in the second quarter of 2008 were 25.3% above the comparable period in 2007.

50. DeFeo commented on the results, in pertinent part, as follows:

> **Results this quarter demonstrate the continued strength of our global franchise. The infrastructure and commodity boom is driving strong demand for our cranes and mining equipment. Based on our increasing backlog for these products, we expect these positive trends to continue**. Also, as expected, this was partially offset by slower growth trends in the Aerial Work Platforms (AWP) segment and further softening in the Construction segment. Though both AWP and Construction experienced growth this past quarter, slower growth in Western Europe impacted their performance.
>
> Not surprisingly, input costs continue to present challenges for us. To offset this, we are implementing various price increases and maintaining cost discipline. While in total we expect higher pricing will largely offset the cost increases that we have already incurred, as well as additional cost increases that we expect to incur during the second half of 2008, we do expect that there will be a lag between when higher costs are incurred and price increases to our customers take effect. Accordingly, we anticipate some reduction in operating margin in our business during the remainder of 2008.
>
> The power of our strategy of product and geographic diversity is illustrated in our results. We have been able to continue to grow net sales and income through an evolving sales mix. The Cranes and Materials Processing & Mining (MPM) segments grew dramatically during the period. Geographically, we continue to see significant growth in developing markets in line with global infrastructure development. Over time, our percentage of sales to developing markets has steadily increased, with first half 2008 net sales in these regions representing approximately 22% of our total sales.

* * *

> **We expect our performance for 2008 to be within our previously announced range for earnings per share of $6.85 to $7.15 and net sales of $10.5 to $10.9 billion.** We expect strong infrastructure and commodity demand trends for our Cranes and MPM segments to continue, which will drive a higher portion of our net sales and income for the balance of 2008.

* * *

> Our global and product diversification has allowed the Company to perform well despite the difficult economic conditions in the U.S., softening of the markets in Western Europe and increasing input costs. Demand remains strong for many of our products, and we are continuing to invest in our business for today and tomorrow, particularly in developing markets such as China and India. We expect world demand for infrastructure, energy and mining products to continue, while at the same time we are positioning our businesses for the eventual recovery in the U.S. market. We remain confident in our ability to achieve our previously stated goal of '12 by 12 in 10', which is $12 billion in revenues with a 12% operating margin by 2010. By quickly adapting to changing market conditions in all of our segments and geographies, we are showing that we can provide products that meet our customers' needs worldwide, and at the same time improve our financial performance and invest in growth for the Company. (Emphasis added).

51. Tom Riordan, Terex President and Chief Operating Officer, added:

> We are progressing well with our key internal initiatives. We continue to invest in appropriate capacity expansion, focusing on up-cycle businesses such as cranes and mining equipment and developing markets, and at the same time we are keenly focused on improving existing capacity and our cost structure to better meet changes in demand and customer needs. As appropriate, headcount and overhead levels are being adjusted globally in line with changes in product demand and the Company's evolving global manufacturing footprint. Finally, we have successfully gone live with the implementation of the Terex Management System at three businesses in the U.S., Germany and U.K. We believe that this new enterprise wide system will contribute to improved efficiency in

> our operations over the long term, as we consolidate our information systems.

52. The Company reiterated these results in its Quarterly Report on Form 10-Q filed with the SEC on August 1, 2008. The Quarterly Report went on to discuss impairment charges as follows:

> As of June 30, 2008, the roadbuilding reporting unit within the Roadbuilding, Utility Products and Other segment did not meet the forecasted business performance used in the annual goodwill impairment test as of October 1, 2007. The downturn in the U.S. residential housing market and limited funding for infrastructure projects has negatively impacted the businesses in which this reporting unit operates.
>
> The Company updated its forecast to address the impact of changes in business conditions and performed a goodwill impairment test as of June 30, 2008 for the roadbuilding reporting unit. The roadbuilding reporting unit passed the test and no impairment charge was recorded. The Company will continue to monitor the estimated fair value of the roadbuilding business for purposes of determining whether impairment is evidenced. The amount of goodwill recorded for the roadbuilding reporting unit as of June 30, 2008 was $39.7.

**<u>The Truth Slowly Emerges</u>**

53. On September 4, 2008, the Company issued a press release entitled "Terex Updated 2008 Earnings Guidance and Confirms Terex Investment Analyst Meeting." The press release stated, in pertinent part, as follows:

> Terex Corporation (NYSE: TEX) today announced that it is updating 2008 full year guidance and providing quarterly guidance due to changing market conditions. Full year 2008 earnings per share are expected to be between $6.35 and $6.65 compared to $5.85 for the full year 2007, a 9% to 14% increase. Net sales for 2008 are expected to be in the range of $10.2 to $10.6 billion. This guidance compares to the previously announced range for 2008 earnings per share of $6.85 to $7.15 and net sales of $10.5 to $10.9

> billion.
>
> Earnings per share are expected to be between $1.26 and $1.38 for the third quarter of 2008 and between $1.20 and $1.33 in the fourth quarter of 2008. This outlook reflects an effective tax rate of approximately 33% and the continued benefit of reduced share count from the Company's share repurchase program. All per share amounts are on a fully diluted basis.
>
> "While our Cranes and Materials Processing & Mining segments continue to perform better than our expectations, continued market softening and input costs in the Aerial Work Platforms and Construction segments in Western Europe and the United States are expected to more than offset those positive factors," commented Ron DeFeo, Terex Chairman and Chief Executive Officer.

54. As a result this news, on September 4, 2008, the Company's stock price plunged $9.30 (20%) to close at $38.02 per share.

55. On October 22, 2008, the Company issued a press release announcing its financial results for the third quarter 2008. Specifically, the Company reported net income for the third quarter of 2008 of $93.8 million, or $0.96 per share, compared to net income of $151.5 million, or $1.45 per share, for the third quarter of 2007, a decrease in earnings per share of 33.8%. These results include a $10.1 million after-tax, or $0.10 per share, charge related to a crane repair program, and charges associated with reductions in headcount of $2.2 million after-tax, or $0.02 per share. The press release went on to state, in pertinent part, as follows:

> Net sales in the third quarter of 2008 grew 14.5%, to $2,514.6 million, versus the comparable period in 2007. The increase in net sales versus the prior year period was favorably impacted by acquisitions and by the translation effect of foreign currency exchange rate changes (3.6% and 4.9%, respectively). Excluding these effects, net sales increased 6.0% in the third quarter of 2008 versus the prior year period, driven primarily by strong performance in both the Cranes and Materials Processing &

Mining (MPM) segments, partially offset by lower net sales in the Aerial Work Platforms (AWP) and Construction segments.

* * *

**The Company is revising its estimated fourth quarter 2008 earnings per share guidance to reflect changing market conditions, mainly in North America and Western Europe for the AWP and Construction segments, to between $0.80 and $0.90, resulting in full year 2008 earnings per share guidance between $5.69 and $5.79.** Corresponding full year 2008 net sales are expected to be between $10.0 and $10.3 billion. These estimates include a total of $0.12 per share in charges through the third quarter 2008 for the crane repair program and headcount reductions. The full year 2008 guidance does not include additional charges that may be required to implement further cost reduction activities. **Management's previous earnings per share guidance for the fourth quarter was between $1.20 and $1.33 and full year 2008 earnings per share guidance was between $6.35 and $6.65**. (Emphasis added).

56. DeFeo commented on the results, in pertinent part, as follows:

While we continue to make progress on our improvement initiatives, the current environment is challenging, marked by a continued global credit crisis and worsening economic conditions, particularly in the U.S. and Western Europe. Input costs continue to present challenges for us, although we expect these to moderate over time. At this time, our price increases have not yet fully offset our total material cost increases. We are taking aggressive actions to better position the Company for the expected reduced net sales levels of the next twelve months, in particular in the AWP, Construction, and Materials Processing businesses. At the same time, we are continuing to invest in developing markets and our improvement initiatives, as well as increasing Cranes and Mining capabilities to meet the growing demand in those areas.

We expect 2009 net sales, including the effect of announced acquisitions, to be similar to 2008 full year net sales, driven by continued strong results in Cranes and Mining, offset by lower net sales in AWP, Materials Processing and Construction. The Cranes and Mining businesses continue to grow, in particular in developing markets, where we expect current positive trends to

> continue. Beginning in the fourth quarter of 2008, for the next twelve months we expect net sales for AWP to be down 30%-40%, for Materials Processing to be down 15%-20% and for Construction to be down 25%-35% versus the prior twelve month period. In light of these overall expectations, we have taken or initiated several actions to properly size our organization and production levels. Additionally, we have further heightened our focus on cash generation during this time of uncertain access to credit.

57. Tom Riordan, Terex President and Chief Operating Officer, added:

> We are taking a series of actions to aggressively reduce costs and inventories in the businesses listed below. We expect that by early 2009 we will achieve working capital levels closer to 22% of trailing three month annualized net sales, versus the approximately 25% level we experienced at the end of the third quarter.
>
> - AWP – In the third quarter, we reduced our global workforce by 6% compared to June 2008. This does not include the elimination of the AWP temporary agency workers in July 2008. In the fourth quarter, we expect a further 18% workforce reduction, compared to June 2008, to better align our cost structure with expected customer demand. Additionally, temporary shutdowns of our manufacturing facilities were implemented in the third quarter and will continue to be used to reduce production output. We will re-evaluate our team member levels in the first quarter of 2009 based on customer order rates and production levels.
>
> - Construction – In the third quarter, our actions included adjusting production lines to short-time work weeks and reducing 141 team members to match current market demand. Further reductions are expected to occur over the next three to six months to adjust the team member levels to meet expected customer demand. We expect a further 17% workforce reduction across our worldwide operations.
>
> - Materials Processing – In the third quarter, we cut production levels by 25% of the first half 2008 run rate and, as a result, we reduced our independent contract manufacturing staffing levels. During the fourth quarter of

2008, production levels are projected to be reduced to roughly 50% of the first half 2008 levels, through the use of an extended winter shutdown, a shortened work week, further independent contractor reductions and an expected reduction of 160 team members.

- Roadbuilding – In the third quarter, we reduced the workforce by 98 team members to adjust production levels and resources to meet expected customer demand.

- Facility Rationalization – In addition to the above actions, facility plans are being reviewed to improve the utilization of existing facilities through consolidation, transfer or sale. Our expectation is that these changes will take place in 2009.

- Segment Realignment – Effective in January 2009, we will move the Roadbuilding businesses under the Construction segment and move the Utility Products business under the AWP segment. This will enable us to capture market synergies and streamline our cost structure in the U.S.

We expect that these actions will reduce our long term cost structure in line with market requirements.

58. The Company reiterated these results in its Quarterly Report on Form 10-Q filed with the SEC on November 3, 2008. The Quarterly Report went on to discuss impairment charges as follows:

> As of September 30, 2008, the roadbuilding reporting unit within the Roadbuilding, Utility Products and Other segment and the Construction segment, which is a reporting unit, did not meet the forecasted business performance used in the annual goodwill impairment test as of October 1, 2007. The downturn in the U.S. residential housing market, limited funding for infrastructure projects and decreased demand has negatively impacted the businesses in which these reporting units operate.
>
> The Company updated its forecast to address the impact of changes in business conditions and performed a goodwill impairment test as of September 30, 2008 for the roadbuilding and construction

> reporting units. The Company's assessment of the roadbuilding and construction reporting units' goodwill resulted in no impairment being evidenced at September 30, 2008. The Company will continue to monitor the estimated fair value of the roadbuilding and construction businesses for purposes of determining whether impairment is evidenced. The amount of goodwill recorded for the roadbuilding and construction reporting units as of September 30, 2008 was $52.6 and $364.2, respectively.

59. On February 3, 2009, the Company issued a press release revising its 2008 guidance. The press release stated, in pertinent part, as follows:

> Terex Corporation (NYSE:TEX) announced that it expects its earnings for 2008 to be approximately 5% below the low end of its previous full year guidance of between $5.69 and $5.79 per fully diluted share. This revised guidance excludes charges associated with the reduction of our production levels, asset impairments and certain other items. Comparable earnings for the full year 2007 were $5.85 per fully diluted share.
>
> **Although not yet finalized, the Company expects to record a non-cash impairment charge of certain of the Company's goodwill, identifiable intangibles and other non current assets principally related to its Construction, Roadbuilding and Utilities businesses.** This impairment charge is estimated to be approximately $600 million, only a portion of which will be tax affected. We are currently in compliance with all of the financial covenants under our bank credit facilities and indentures and this impairment charge will not affect our compliance.
>
> Commenting on the new guidance, Terex Chairman and Chief Executive Officer Ron DeFeo said, "Our fourth quarter 2008 results were affected by the rapid change in global economic conditions more than we anticipated, as well as continued input cost pressure. We continue to feel the negative effect that credit availability has on customer sentiment and demand for our products, particularly in our Construction, Materials Processing and Aerial Work Platforms businesses, as well as our smaller crane and tower crane product lines."
>
> Mr. DeFeo continued, "In response to the present economic environment, we are taking and will continue to take aggressive

> actions to reduce costs and inventories in all of our businesses. We feel we have responded appropriately with significant actions already in progress, many of which we began late last summer and fall. Our actions include reductions in force, significantly curtailed production schedules in affected businesses, including temporary and permanent factory shutdowns, facility consolidations, the rescheduling of incoming raw materials and reducing executive compensation costs." (Emphasis added).

**<u>Terex Stock Was an Imprudent Investment for the Plan</u>**

60. On February 11, 2009, after the Market closed, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2008, and provided guidance for fiscal year 2009. Specifically, the Company announced a net loss for the fourth quarter of 2008 of $421.5 million, or $4.46 per share. The net loss in the fourth quarter includes pre-tax non-cash charges of $459.9 million, or $4.84 per share, for the impairment of goodwill. These charges were in the Company's Construction, Roadbuilding and Utility Products businesses. Additionally, the Company incurred pre-tax charges of $21.8 million, or $0.24 per share, primarily associated with a reduction in production levels in the fourth quarter of 2008. These results compare to net income of $174.0 million, or $1.67 per share, for the fourth quarter of 2007. The press release went on to state, in pertinent part, as follows:

> Net sales for the fourth quarter of 2008 dropped by approximately 20% to $2.08 billion versus $2.59 billion in the fourth quarter of 2007, as declining demand in the Company's Aerial Work Platforms, Construction and Materials Processing businesses continued. The translation effect of foreign currency exchange rate changes negatively impacted fourth quarter 2008 net sales by approximately 8%, while acquisitions added approximately 2% to net sales over the prior year's fourth quarter.
>
> For the full year 2008, the Company reported net income of $71.9

million, or $0.72 per share, compared to net income of $613.9 million, or $5.85 per share, for the full year 2007. The goodwill impairment charges mentioned above reduced net income by $4.60 per share for the full year, and other pre-tax charges totaling $25.8 million, primarily related to adjustment of the Company's production levels, decreased full year 2008 net income by $0.18 per share. Net income for 2007 included a $12.5 million pre-tax charge related to the early extinguishment of the Company's 9-1/4% Senior Subordinated Notes, which negatively impacted earnings per share by $0.08.

Net sales were $9.89 billion in 2008, an increase of 8.2% from $9.14 billion in 2007. The translation effect of foreign currency exchange rate changes accounted for approximately 3% of the increase in net sales and acquisitions contributed approximately 3% of the increase in net sales. The strong full year performance of the Cranes and Mining businesses were offset by the dramatic decline in demand for many of the Company's other products during the second half of 2008, largely due to the impact of the rapidly deteriorating global economy.

Ron DeFeo, Terex Chairman and Chief Executive Officer, stated, "This past year has been like no other – the first half of the year exhibited robust growth and expansion, while the second half of the year was severely impacted by the global credit crisis and economic deterioration, which drove significant declines in customer demand in our businesses. For the full year, net sales increased significantly in our Cranes and Mining businesses, but were offset by the results in our Aerial Work Platforms, Construction, and Materials Processing businesses, which experienced considerable weakness in the second half of the year. Excluding the goodwill impairment charges, our net income for the year was good given the economic environment. Although we are disappointed with our current working capital levels, we have taken aggressive actions to adjust our production to meet reduced customer demand. We maintained a strong cash position and ended the year with a solid balance sheet and sufficient liquidity to execute our key business plans."

Mr. DeFeo continued, "Given the current market conditions, it is difficult to project 2009 performance with a reasonable degree of certainty. However, we are planning for continued softness in demand. We are experiencing increasing levels of cancellations in

> our backlog for crane and mining products, as well as delays in acceptance of deliveries, as our customers in these areas are not immune to the effects of the global economic downturn. Based on what we know today, we expect our net sales for 2009 to decline by 30% to 35% from 2008. The translation effect of foreign currency exchange rate changes is expected to contribute approximately 13% of this decline. Given the uncertainty and volatility in today's environment, we are not providing earnings guidance until we have better visibility; however, we will continue to take aggressive actions to reduce operating costs and improve our cash flow."

61. As a result of this news, on February 12, 2009, the first day of trading after the announcement, the Company's stock price fell $4.17 (31%) to close at $9.45 per share.

62. On February 13, 2009, as a result of the news, the Company's stock price target was slashed to $7.50 from $16 by Goldman Sachs, which maintained a neutral rating on the Company's common stock. That same day, BMO Capital Markets cut its rating on Terex common stock to "market perform" from "outperform," citing softening demand in the Company's end markets and a possible covenant risk. The Company's Materials Processing and Mining segment is expected to become "significantly weaker than expected, with no visibility for improvement in 2009," BMO analyst Charles Brady said in a research note dated February 12, 2009.

63. On February 27, 2009, the Company filed a Form 10-K with the SEC which stated, with regard to the above-identified $459.9 asset impairment charge, that:

> As of October 1, 2008, we performed our annual goodwill impairment test, which resulted in a non-cash impairment charge for goodwill of $459.9 million, which represented all of the goodwill recorded in the Construction and RBUO segments. However, we do not believe that non-cash impairment charges are indicative of returns on our invested capital. Therefore, we have excluded the effect of these impairment charges from the metrics

> used in our calculation of ROIC. As the tables below show, our ROIC at December 31, 2008 was 19.2%, down from 28.9% at December 31, 2007. The decrease reflects reduced NOPAT performance from approximately $641 million to approximately $601 million and the increased invested capital impact of recent acquisitions of approximately $482 million.

64. In a Dow Jones Factiva article, entitled "Month to February 27: Terex Corporation trails 93.7% of stocks, price 46.6% below volume weighted price," it was reported that "Terex Corporation (TXG.F) crashed Eur04.65 (or 41.7%) to Euro6.50 in the month ending February 27. In the German market of 9,443 stocks, the stock has a 6-month relative strength of 6 indicating it is trailing 94.0% of the market. The stock fell for a second month in February. Compared with the DAX index which fell 479.7 points (or 11.1 %) in the month, this represented a relative price change of -30.6%."

65. This decrease in the value of the Company's stock was caused by problems in the Company's Construction and RBUO segments, which were known or should have been known by the Plan's fiduciaries and were "probable" and "reasonably estimable." Instead of making disclosures when "there was at least a reasonable possibility that a loss or an additional loss may have been incurred," as required by FASB 5, the Company choose to only do so annually. Defendants imprudently and disloyally continued to allow Terex stock to be offered as a Plan investment option despite the high probability that the Company's assets were materially overstated.

66. As a result of the Company's problems, as described above, the Company's stock, which had been trading above $66.00 per share on February 21, 2008, the first trading day of the Class Period, declined to a closing price of $8.92 per share on February 27, 2009, a decrease of

more than $57.00 per share, or over 86%, thereby greatly diminishing the retirement benefits of Plaintiff and the Plan. Meanwhile, the Plan's fiduciaries, despite having fiduciary duties and unfettered discretion to protect the retirement savings of the proposed Class, did not fulfill their duties under ERISA to protect the retirement savings of Participants.

## THE LAW UNDER ERISA

67. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

68. ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

69. ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

70. These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law." They

entail, among other things:

(a) the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in Terex Stock, to ensure that each investment is a suitable option for the Plan;

(b) the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

© a duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

71. ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes

reasonable efforts under the circumstances to remedy the breach."

72. Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

**DEFENDANTS' FIDUCIARY STATUS**

73. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

74. During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

75. During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company Stock. Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

76. In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable. To the extent any of the

Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

**CAUSES OF ACTION**

**COUNT I**

77. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

78. At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

79. As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company Stock.

80. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Terex Stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

81. A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would

lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

82. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering losses as a result of the Plan's investment in Terex Stock. Further, given that such a high concentration of the assets of the Plan was invested in the stock of a single company (Terex), Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments. All categories of Defendants failed to implement any such strategy.

83. The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

84. Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering Company Stock as an investment option in the Plan; enabling Defendants' failure to prudently manage the Plan's assets with respect to the Plan's investments; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

85. Specifically, at least some of the Defendants had actual knowledge of Terex's corporate malfeasance and questionable reporting and business. In addition, in light of their

high-ranking positions as high ranking officers at the Company, Director Defendants had/should have had constructive knowledge of these activities.

86. Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing Participants that the Plan's holdings of Terex Stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in Terex Stock, despite inarguably having knowledge of such breaches.

87. Furthermore, through their own failure to prudently and loyally manage the Plan's investment in Terex Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, Defendants enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in Terex Stock.

88. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT II**

89. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

90. At all relevant times, as alleged above, Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

91. As alleged above, the scope of Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to Participants regarding the Plan and assets of the Plan. In addition, Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plan.

92. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in Terex Stock.

93. Because a substantial percentage of the Plan's assets were invested in Terex Stock, and Defendants chose to invest overwhelmingly in Terex Stock, such investment carried with it an inherently high degree of risk. This inherent risk made Defendants' duty to provide complete and accurate information particularly important with respect to Company Stock.

94. Specifically, Terex, through its officers and directors, issued a multitude of false and misleading statements through SEC filings and press releases regarding value of Terex Stock and the financial health of the Company.

95. Upon information and belief, such communications were disseminated directly to

all Participants, which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports furnished by Terex, through its officers and Director Defendants. In addition, upon information and belief, the Company communicated directly with all Participants regarding the merits of investing in Terex Stock in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding Terex Stock as required by ERISA.

96. In addition, Defendants were responsible for providing Participants in the Plan with investment education and communication. Defendants, however, failed to disclose any information to Plan Participants regarding Terex's business practices and how these activities adversely affected Company stock as a prudent investment option under the Plan. Defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plan.

97. Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding Terex Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of Terex Stock and the prudence of investing retirement contributions in the Company's stock.

98. These failures were particularly devastating to the Plan and the Participants, as a significant percentage of the Plan's assets were invested in Terex Stock during the Class Period and, thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

99. In addition, Terex and the other defendants knew or should have known that information they possessed regarding the true condition of Terex would have an extreme impact on the Plan. Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

100. As a consequence of the failure of Defendants to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Terex Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, Terex Stock was an inherently unsuitable and inappropriate investment option for their Plan accounts. Had accurate information been provided, Participants could have protected themselves against losses accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

101. As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If these Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

102. Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**COUNT III**

103. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

104. At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). At all relevant times, as alleged above, the scope of the fiduciary responsibilities of Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. Defendants had the duty to:

(a) Ensure that the appointed Plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, as noted above, and the behavior of the Plan's Participants;

(b) Ensure that the appointed Plan fiduciaries are provided with adequate financial resources to do their job;

© Ensure that the appointed Plan fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d) Ensure that the appointed Plan fiduciaries have ready access to outside, impartial advisors when needed;

(e) Ensure that the appointed Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f) Ensure that the appointed Plan fiduciaries report regularly to the Company,

the Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

105. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

106. Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed Plan fiduciaries were given adequate information about the Company's business problems alleged above, which made Company Stock an imprudent investment, which was necessary for them to perform their duties of overseeing the Plan's investments, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.

107. Defendants also breached this duty by not properly disclosing information, that they knew or should have known, about the Company's improper business practices to the Trustee. The Trustee is responsible for investing and managing assets of the Plan. However, in doing so, the Trustee shall be subject to the direction and guidance of Terex.

108. Defendants knew or should have known that the fiduciaries they were responsible

for monitoring were (a) imprudently allowing the Plan to continue offering Terex Stock as an investment alternative for the Plan, and (b) continuing to invest the assets of the Plan in Terex Stock when it no longer was prudent to do so. Despite this knowledge, Defendants failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of these fiduciaries' failures.

109. Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed Plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

110. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

111. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C., § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT IV**

112. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

113. At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

114. ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty; that is, a duty to discharge his/her duties with respect to a plan solely in the

interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

115. Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plan and its Participants and beneficiaries. These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and Terex stockholders), and the interests of the Plan's Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

116. Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Terex Stock; failing to notify appropriate federal agencies, including the SEC of the facts and transactions which made Terex Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company Stock.

117. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT V**

118. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

119. ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or © he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

120. As alleged herein, Terex, through its officers and employees, withheld material information from the Plan's Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law. In addition, as alleged herein on information and belief, Defendants participated in and/or knew about the Company's misrepresentations regarding the Company's financial condition. Thus, these defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Terex Stock as an investment for the Participants' retirement assets.

121. Despite this knowledge, Defendants knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of Terex Stock during the Class Period. They did so by themselves making imprudent and disloyal

decisions respecting the Plan's investment in Terex Stock in the manner alleged herein in violation of ERISA § 405(a)(l)(A). In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in Terex Stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)©.

122. In further violation of ERISA § 405(a)(l)©, Defendants also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole. Instead, they compounded the problem by downplaying the significance of Terex's problems and further concealing such practices from Participants and the market as a whole.

123. In addition, Defendants enabled the imprudent asset management decisions of any and all other Defendants -- including any appointed Plan fiduciaries -- who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in Terex Stock. In so doing, these Defendants breached ERISA § 405(a)(l)(B).

124. Further, through their failure to properly and effectively monitor and remove those fiduciaries whose performance was inadequate as alleged above, Defendants enabled these

appointed Plan fiduciaries' imprudent management of the Terex Stock in the Plan.

125. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

126. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

127. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

128. To the extent that Terex is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Terex knowingly participated in the breaches of those defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

129. Terex benefitted from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by contributing Terex Stock to the Plan while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of Terex providing the market with materially misleading statements and omissions. Accordingly, Terex may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Terex Stock which would have been contributed to the Plan, but for Terex's participation in the foregoing breaches of fiduciary duty.

## CAUSATION

130. The Plan suffered millions of dollars in losses in plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Terex Stock during the Class Period, in breach of Defendants' fiduciary duties. These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

131. Defendants are responsible for losses in Plan benefits caused by the Participants' direction of investment in Terex Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404©, 29 U.S.C. § 1104©, and the regulations promulgated thereunder. Defendants concealed material, non-public facts from Participants, and provided inaccurate, incomplete and materially misleading information to them regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle. As a consequence, Participants could not exercise independent control over their investments in Terex Stock, and Defendants remain liable under ERISA for losses caused by such investment.

132. Defendants are also responsible for all losses in Plan benefits caused by the investment of the Plan's Company Contributions in Terex Stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

133. Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Terex Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of Terex Stock when maintaining such an

investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

134. Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiff relied to their detriment on the misstatements and omissions that Defendants made to Plan Participants.

**REMEDY FOR BREACHES OF FIDUCIARY DUTY**

135. Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Terex Stock during the Class Period. As a consequence of Defendants' breaches, the Plan suffered significant losses.

136. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes such other "equitable or remedial relief as the court may deem appropriate . . . ."

137. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

138. Plaintiff and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); © reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

139. Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

**ERISA SECTION 404© DEFENSE INAPPLICABLE**

140. ERISA § 404© is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from Participants' exercise of control over investment decisions. In order for § 404© to apply, Participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404©, 29 U.S.C. § 1104©, and the regulations promulgated under it.

141. Those provisions were not complied with here as, among other reasons, instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, Defendants did exactly the opposite. As a consequence, Participants in the Plan did not have informed control over the portion of the Plan's assets that

were invested in Terex Stock as a result of their investment directions, and Defendants remained entirely responsible for losses that result from such investment.

142. Because ERISA § 404(c) does not apply here, Defendants' liability to the Plan, the Plaintiff and the Class for relief stemming from Participants' decisions to invest contributions in Terex Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

143. Furthermore, under ERISA, fiduciaries -- not Participants -- exercise control over the selection of investment options made available to Participants. Thus, whether or not Participants are provided with the ability to select among different investment options, and whether or not Participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to Participants, and as a result of such action the Plan suffers a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plan.

144. Finally, Defendants remain liable for Plan losses that pertain to Terex Stock acquired by the Plan with employer contributions, as Participants did not exercise any control.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the proposed Class, prays for:

A. a declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to Plaintiff and the other Participants;

B. a declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C. an Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

D. imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E. an Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F. an Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Terex Stock;

G. actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

H. an Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I. an Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

J. an Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all claims so triable.

Respectfully submitted,

/s/ Patrick A. Klingman

James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen M. Leser-Grenon (ct23587)
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
jmiller@sfmslaw.com
pklingman@sfmslaw.com
kleser@sfmslaw.com

Mark C. Rifkin
Martin E. Restituyo
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Ave.
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

Frank A. Bottini
Derek J. Wilson
Johnson Bottini, LLP
655 W. Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 238-0622

Attorneys for Plaintiff and the Proposed Class